**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| BRYAN S. B.[1], ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 1:19-CV-392-JD-MGG |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

On September 10, 2019, Plaintiff Bryan S. B. ("Mr. B") filed his complaint in this

Court seeking judicial review of the Social Security Commissioner's final decision

denying his application for Disability Insurance Benefits ("DIB") under Title II of the

Social Security Act ("the Act"), and Supplemental Security Income ("SSI") benefits

under Title XVI of the Act. Mr. B's case was referred to the undersigned for a report and

recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b), and N.D.

Ind. L.R. 72-1(b). For the reasons stated below, the undersigned recommends that the

Court affirm the Commissioner's final decision.

I.    **RELEVANT BACKGROUND**

   A.    **Procedural Posture**

On January 4, 2017, Mr. B applied for DIB and SSI alleging disability beginning

October 20, 2015. Both claims were denied initially and again upon reconsideration.

---

[1] To protect privacy interests, and consistent with the recommendation of the Judicial Conference, the
Court refers to the plaintiff by first name, middle initial, and last initial only.

After a hearing on April 16, 2018, the Administrative Law Judge ("ALJ") issued a decision on August 23, 2018, concluding that Mr. B is not disabled under the Act. Thus, Mr. B's claims for DIB and SSI benefits were denied.

Mr. B now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). Claimants, like Mr. B., are entitled to judicial review of "any final decision of the Commissioner . . . made after a hearing . . . ." 42 U.S.C. § 405(g). For judicial review, Section 405(g) "contains two separate elements: first, a 'jurisdictional' requirement that claims be presented to the agency, and second, a 'waivable . . . requirement that the administrative remedies prescribed by the Secretary be exhausted.'" *Smith v. Berryhill*, 139 S. Ct. 1765, 1773 (2019) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976)); *see also Johnson v. Sullivan*, 922 F.2d 346, 352 (7th Cir. 1990). There is no dispute here that Mr. B presented his claims for DIB and SSI to the SSA satisfying the jurisdictional requirement of Section 405(g). However, the Court cannot verify from the record before it whether Mr. B exhausted his administrative remedies before the SSA.

With authority delegated by Congress through Section 405(g), the SSA has promulgated rules establishing a four-step administrative process for claimants before they obtain judicial review. *Smith*, 193 S. Ct. at 1772; *see also Sims v. Apfel*, 530 U.S. 103, 106 (2000). Those steps include an initial determination by the Agency, reconsideration of the initial determination, a hearing before an ALJ, and review by the Appeals Council. 20 C.F.R. §§ 404.900; 416.1400[2]. Exhaustion of those steps may be waived by the

---

[2] Regulations governing applications for DIB and SSI are almost identical and are found at 20 C.F.R. § 404 and 20 C.F.R. § 416 respectively. Going forward, this Report and Recommendation will only refer to 20 C.F.R. § 404 unless explicit distinction between the DIB and SSI regulations is necessary.

Commissioner if the internal needs of the agency are fulfilled without exhaustion or if a claimant seeks relief the Commissioner cannot grant. *See Smith,* 139 S. Ct. at 1774; *Mathews,* 424 U.S. at 330; *Weinberger v. Salfi,* 422 U.S. 749, 767 (1975); *cf. Frohwerk v. Brinkley,* 2009 WL 2106212, at *1–*2 (N.D. Ind. July 14, 2009) (dismissing Social Security complaint for lack of subject matter jurisdiction without, *inter alia,* allegations that the SSA waived the Section 405(g) requirement for exhaustion of administrative remedies). The exhaustion requirement can also be excused by the courts. *See Smith,* 139 S. Ct. at 1774 (citing *Bowen v. City of New York,* 476 U.S. 467, 484).

Here, the record includes documentation of the initial determination, the reconsideration, and the ALJ's hearing but not the Appeals Council's review of Mr. B's claim. Based on what is included in the record, however, the Court might infer that Mr. B requested review of the ALJ's decision by the Appeals Council and that it addressed Mr. B's request. Specifically, Mr. B's Complaint references a Notice of Appeals Council Action dated July 12, 2019, which is not incorporated into the administrative record, but presumably confirms the Appeals Council's action. [DE 1 at 1, ¶ 3]. The Commissioner also appears to verify that the Appeals Council acted on Mr. B's claim by stating in his response brief that "[t]he Appeals Council denied Plaintiff's request for review on November 23, 2018, making the ALJ's decision the final decision of the Commissioner."[3] [DE 21 at 1]. Any inference of action by the Appeals Council may be weakened because

---

[3] In support of his statement regarding the Appeals Council's alleged November 2018 action, the Commissioner cites to a letter dated November 23, 2018, that is included in the administrative record. That letter to Mr. B's counsel from the SSA's Office of Appellate Operations only explains procedures for requesting review by the Appeals Council. [DE 12 at 9–11]. It does not prove that Mr. B sought review from the Appeals Council or that the Appeals Council reached any decision on Mr. B's claim.

the parties identify two different dates for the same alleged action by the Appeals Council. Moreover, the record prevents any conclusive clarification as to which, if either, date is correct. Nevertheless, these statements show support from both parties of an inference that Mr. B requested review of the ALJ's decision from the Appeals Council and that the Appeals Council acted in some way on that request satisfying the exhaustion requirement of Section 405(g).

In addition to the inference that Mr. B requested review of the ALJ's decision from the Appeals Council and received some decision regarding that request from the Appeals Council, the Commissioner did not respond to Mr. B's Complaint with a motion to dismiss for failure to state a claim based on exhaustion of administrative remedies. Taken together, the inference of exhaustion and the Commissioner's apparent consent to judicial review of Mr. B's claim suggest that the Commissioner has, at the very least, waived any exhaustion requirement. Thus, whether Mr. B actually exhausted his administrative remedies or the Commissioner waived Section 405(g)'s exhaustion requirement as is his right, the ALJ's decision is deemed the final decision of the Commissioner and is reviewable by this Court. *See Smith*, 139 S. Ct. at 1773–75; *see also* 20 C.F.R. § 404.981.

### B.    The ALJ's Decision

In order to qualify for DIB and SSI, a claimant must be found disabled under the Act. The Act defines "disabled" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 423(d)(1)(A). A claimant has the burden to prove disability by establishing he has physical or mental impairments of such severity that he is prevented from performing previous work and cannot—when considering age, education, and work experience—engage in substantial gainful activity ("SGA") that exists in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), (5)(A); 20 C.F.R. §§ 404.1512(a).

Under 42 U.S.C. § 423(d), the Commissioner conducts a five-step inquiry in evaluating DIB and SSI claims. The steps include determinations as to: (1) whether the claimant is engaged in SGA; (2) whether the claimant has a severe impairment such that basic work activities are significantly limited; (3) whether any of the claimant's severe impairments, alone or in combination, meet or equal one of the Listings in 20 C.F.R. Part 404, Subpart P, App. 1; (4) whether the claimant's impairment precludes the performance of past relevant work based upon his residual functional capacity ("RFC"); and (5) whether the claimant's impairments prevent the performance of any other work, considering the RFC. 20 C.F.R. § 404.1520. The burden of proof rests on the claimant for the first four steps then shifts to the Commissioner for the final step. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000); *see also* 42 U.S.C. § 423(d)(5)(A).

In Mr. B's case, the ALJ first determined that he had not engaged in SGA since the alleged onset date. The ALJ then found that Mr. B's osteoarthritis of both hips with replacements of both, degenerative disc disease of the spine, obesity, and diabetes mellitus with peripheral polyneuropathy constitute severe impairments. [DE 12 at 20]. *See* 20 C.F.R. § 404.1520(c). The ALJ further concluded that Mr. B's hyperlipidemia, hypertension, GERD/heartburn, and migraines are non-severe impairments. *See* 20

C.F.R. § 404.1522. Finding none of Mr. B's impairments, nor a combination of his impairments, met or medically equaled the severity of one of the Step Three Listings, the ALJ found that Mr. B has the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), but with additional postural, exertional, and environmental limitations.

Using this RFC, the ALJ determined that Mr. B is unable to perform his past relevant work as an industrial truck operator, diesel mechanic, stores laborer, deliverer, group leader, cook, and cleaner as defined by the Dictionary of Occupational Titles ("DOT"). However, the ALJ concluded that jobs exist in significant numbers in the national economy that Mr. B can perform, including production inspector, production assembler, and addresser as defined by the DOT. Accordingly, the ALJ concluded that Mr. B is not disabled as defined by the Act.

## II.    STANDARD OF REVIEW

In reviewing a disability decision by the Commissioner, this Court must accept the Commissioner's factual findings if supported by substantial evidence. 42 U.S.C. § 405(g); *Clifford,* 227 F.3d at 869. Thus, the Court will reverse only if the ALJ's findings are not supported by substantial evidence, or if the ALJ has employed erroneous legal standards. *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *see also Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

Substantial evidence must be "more than a scintilla but may be less than a preponderance," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007); *Richardson v. Perales*, 402 U.S. 389, 401 (19171); *see also Summers v. Berryhill*, 864 F.3d 523,

526 (7th Cir. 2017). The Court reviews the administrative record as a whole to determine whether substantial evidence supports the administrative decision, but it does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The ALJ is not required to address every piece of evidence in the record but must discuss evidence that does not support her conclusion. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). In other words, an ALJ may not ignore an entire line of contradictory evidence, or "cherry-pick facts to support a finding" one way over another. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *see also Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

Furthermore, the ALJ must minimally articulate her analysis of evidence, or build a logical bridge between the evidence and her conclusions, to demonstrate her path of reasoning and to show that she considered the important evidence. *Craft v. Astrue*, 539 F.3d 556, 673 (7th Cir. 2008); *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). A case must be remanded where the ALJ's decision lacks evidentiary support or inadequately provides reasoning for meaningful review. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## III.   ANALYSIS

In seeking review of the ALJ's decision, Mr. B challenges both her Step 3 Listing analysis and her Step 5 analysis.

A.    **Step Three Issues**

At Step Three of the disability analysis, the ALJ considers whether a claimant is eligible for disability benefits under a theory of presumptive disability. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). A claimant is eligible if his impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*; *see also* 20 C.F.R. § 404.1520(a)(4)(iii). For each listed impairment, there are objective medical findings and other specific requirements that must be met to satisfy the criteria of that particular listing. 20 C.F.R. § 404.1525(c)(2)–(3). Even when a claimant's impairments do not satisfy each of the listing's requirements, he can be deemed disabled at Step Three if the record contains "findings related to [his] impairment [or combination of impairments] that are at least of equal medical significance to the required [listing] criteria." 20 C.F.R. § 404.1526(b)(1)(ii). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett*, 381 F.3d at 668. However, an ALJ may rely solely on conclusions that a claimant is not disabled in forms completed by State Agency physicians, even with "little additional explanation, . . . so long as there is no contradictory evidence in the record . . . ." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006).

Here, the ALJ examined Mr. B's severe impairments in relation to the criteria of Listing 1.04, which states:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1. In the section discussing the Step Three analysis, the ALJ concluded in one sentence that "[t]he substantial evidence of record fails to support a finding that claimant experiences evidence of nerve root compromise, spinal arachnoiditis, or lumbar spinal stenosis, as required . . .; thus, this Listing is not met." [DE 12 at 22]. Based on this conclusion, Mr. B argues that the ALJ did not confront evidence that supported the meeting or medical equaling of the Listing but rather dismissed the claim with a conclusory and perfunctory evaluation of Listing 104's criteria. Mr. B focuses the Court's attention specifically upon allegedly ignored evidence contradictory to the ALJ's conclusion that he did not meet Listing 1.04A and the ALJ's

failure to submit that same evidence to a medical expert for an opinion regarding its medical equivalence to the Listing 1.04A criteria.

### 1.    Confrontation of Contrary Evidence

As a preliminary matter, review of the ALJ's Step Three analysis is not limited to review of the section in her decision identifying the listing at issue and reporting a conclusion. Instead, the ALJ's entire decision can be considered in determining the rationale for the Step Three conclusion. *See Jeske v. Saul*, 955 F.3d 583, 590 (7th Cir. 2020). Therefore, the ALJ's subsequent RFC analysis is relevant to the determination of whether she adequately confronted the full range of available evidence in evaluating if Mr. B's impairments—namely his degenerative disc disease—meets or medically equals Listing 1.04A.

To meet Listing 1.04A, a claimant must first demonstrate evidence of the threshold "compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. Pt. 404, Subpt. P, App. 1. Here, Mr. B contends that two lumbar spine MRIs— one in April 2014 and the other in November 2017—establish the threshold nerve root compromise and that the ALJ failed to confront this allegedly conclusive evidence. In support, Mr. B cites to notes from his office visit to Dr. Ahmer Ghori on August 30, 2017, for a reevaluation of his lumbar degenerative disc disease and lumbar spondylosis. Dr. Ghori's treatment plan notes for that day state, among other things, that "[o]n the MRI from 2014, there is lateral recess stenosis at L4-L5 and left sided disc

herniation at L5-S1 impinging the left nerve root."[4] [DE 12 at 522]. Mr. B also cites to an imaging report from a lumbar MRI on November 14, 2017, reviewed by Dr. Shantanu Kulkarni, which states: "[p]robable free disc material at L5-S1 level situated between the left lateral recess and neural foramen with potential for impingement of the left L4 and L5 nerve roots." [DE 12 at 545]. Yet, the ALJ clearly considered this evidence in reaching her conclusion.

First, the ALJ cites to Exhibit 8F—the exhibit that includes Dr. Ghori's August 2017 office note—multiple times in her decision. [*See* DE 12 at 20, 24–25]. As a result, the ALJ did not completely ignore this potentially contradictory evidence related to Mr. B's 2014 lumbar MRI even though she never explicitly mentions it in her decision. *See Denton*, 596 F.3d at 425; *Indoranto*, 374 F.3d at 474.

On top of that, Dr. Ghori's statement about Mr. B's 2014 MRI does not establish nerve root impingement, or compromise, as definitively as he wants the Court to believe. In reaching her decision, the ALJ also considered the actual imaging report, prepared by Dr. Adam M. Gregory, on April 25, 2014, as evidenced by her citation to Exhibit 1F, which includes Dr. Gregory's assessment of Mr. B's April 2014 MRI. [DE 12 at 20, 24, 343]. Dr. Gregory described the MRI results related to the L5-S1 vertebrae as follows: "Although no definite nerve root impingement is identified, please correlate

---

[4] In his reply brief, Mr. B references an August 2017 MRI that he says indicates L5-S1 nerve root impingement. [DE 22 at 3]. Yet Mr. B offers no reference to an August 2017 MRI in the record. Instead, his only citations are in his opening brief to Dr. Ghori's August 2017 treatment plan, which describes the April 2014 MRI as quoted above and the November 2017 MRI. [DE 20 at 11]. Finding no evidence of an August 2017 MRI in the record, the Court assumes that in his reply brief, Mr. B—or more precisely, his counsel—confused the August 2017 office visit record mentioning the April 2014 MRI with the April 2014 MRI itself.

clinically for any signs of left S1 radiculopathy[5]." [DE 12 at 343]. Thus, the ALJ

considered the conflicting statements from Dr. Ghori in August 2017 describing

impingement on the April 2014 MRI and from Dr. Gregory in the April 2014 imaging

report explicitly finding no impingement. The ALJ was well within her authority to

resolve this conflicting evidence. *See Powers v. Apfel*, 207 F.3d 431, 434–35 (7th Cir. 2000).

Second, in assessing Mr. B's L5-S1 level on the November 2017 lumbar MRI, Dr.

Kulkarni reported

> posterior and left lateral spurring with an associated minor disc bulge.
> There is intermediate signal rounded focus measuring 7 to 8 mm situated
> between the left lateral recess and neural foramen. This is likely some free
> disc material that has been extruded previously. Although no direct nerve
> root impingement is seen there is potential for impingement of the left L4
> and L5 nerve roots . . . .

[DE 12 at 544–45]. The ALJ clearly references Dr. Kulkarni's assessment when she states

in her decision that "imaging of the claimant's spine showed degeneration, disc height

loss, and the possibility of free disc material at L5-S1 with the potential for impingement

of nerve roots . . . ." [DE 12 at 25]. Therefore, the ALJ did not ignore the November 2017

MRI that Mr. B also contends establishes the threshold nerve root compromise required

to meet Listing 1.04A. And once again, Mr. B seems to be overestimating the

implications of an MRI. The plain meaning of Dr. Kulkarni's MRI assessment reflects

only potential for impingement with no statement of actual impingement, which is

needed to satisfy Listing 1.04A's threshold requirement of nerve root compromise.

---

[5] "Radiculopathy describes a range of symptoms produced by the pinching of a nerve root in the spinal column" and "frequently include pain, weakness, numbness and tingling." *Radiculopathy*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy (last visited Sept. 21, 2020).

While the ALJ could have discussed the April 2014 and November 2017 MRI results more thoroughly in relation to the threshold nerve root compromise requirement of Listing 1.04A as Mr. B now argues, her failure to do so is harmless because neither MRI established the nerve root compromise Mr. B claims they do.

Without the objective evidence of nerve root compromise, no further consideration of the additional clinical criteria to meet Listing 1.04A is necessary despite Mr. B's efforts to highlight for the Court evidence related to neuroanatomic distribution of pain, diminished range of motion of lower spine, motor loss, and straight leg raising test. Nevertheless, the ALJ cited to all the exhibits in the record that include the evidence Mr. B references as favorable to him related to these criteria. As a result, the ALJ did not ignore this evidence either.

Having confronted the competing evidence related to the criteria for meeting Listing 1.04A, the ALJ's decision is supported by substantial evidence. Despite Mr. B's invitation, this Court will not substitute its judgment for that of the ALJ on the competing evidence both he and the Commissioner present here. *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## 2.    Medical Equivalence Analysis

Even if Mr. B's degenerative disc disease does not meet the criteria of Listing 1.04A, he is entitled to consideration of whether his impairments in combination are equal medically to those of a listed impairment. *See* 20 C.F.R. § 404.1526. Medical equivalence is based upon medical findings and the opinion of "one or more medical or psychological consultants designated by the Commissioner." *Id.* § 404.1526(b)–(c); *see*

13

*also Barnett*, 381 F.3d at 670 ("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."). Here, Mr. B argues that remand is warranted because the ALJ's Listing equivalence analysis lacked any State Agency medical opinions that reviewed the April 2014 and November 2017 lumbar MRIs in reaching a conclusion regarding Listing equivalence.

The Commissioner does not dispute that the State Agency physicians reached a conclusion about Listing equivalence based on a record devoid of the two lumbar MRIs. The ALJ also acknowledged this fact in her decision when she specifically noted that "the State Agency physicians in 2016 and 2017, who determined that the claimant was able to complete a range of light work with postural limitations . . . ., did not have [the] benefit of reviewing evidence that was available at the hearing level." [DE 12 at 25]. As a result, the ALJ concluded that Mr. B's "record overall established] greater physical limits than determined by the State Agency consultants" and found that Mr. B retained a more restrictive RFC of sedentary work with additional limitations. [*Id.* at 23, 25]. Despite the ALJ's more restrictive RFC, Mr. B still contends that the ALJ did not comply with the SSA's regulations and Seventh Circuit precedent by failing to submit the MRIs to medical scrutiny to assess medical equivalence to any listing.

As noted above, the regulations are clear that an ALJ's equivalence analysis must be informed by a medical opinion. *See* 20 C.F.R. § 404.1526(b)–(c). Typically, the Seventh Circuit also demands that ALJs submit "new and potentially decisive evidence" to medical scrutiny to avoid "playing doctor" in assessing medical evidence at any step in the disability analysis. *See, e.g., McHenry v. Berryhill*, 911 F.3d 866, 871–72 (7th Cir. 2018)

14

(Step Three listing analysis); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (subjective symptom analysis). Arguably, the ALJ has erred by failing to comply with the technical requirement to rely upon a medical expert opinion in determining listing equivalence and by reaching some medical judgment on her own as to the effect of the two lumbar MRIs on the listing analysis. The Commissioner unpersuasively attempts to convince the Court that the ALJ did not "play doctor" because she "restated the exact findings and impressions of Plaintiff's November 2017 MRI in [her] decision (*potential impingement*), and . . . also discussed additional substantial medical evidence to show that Plaintiff did not meet Listing 1.04(a), even assuming he could show nerve compression as required." [DE 21 at 12–13]. The Commissioner's argument is a strained attempt to overcome the undisputed fact that the MRIs were never reviewed by a medical expert as required thereby putting the ALJ in the position of assessing medical evidence without the benefit of a medical expert opinion.

Yet, in determining whether this error warrants remand, the question becomes whether the error was harmless. Errors are harmless when the court can "predict with great confidence that the result on remand would be the same." *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Remand is appropriate when a listing analysis is perfunctory and there is some evidence that the claimant may have met the listings. *William M. v. Saul*, No. 19 CV 50043, 2020 WL 4676934, at *5 (N.D. Ill. Aug. 12, 2020) (citing *Minnick v. Colvin*, 775 F.3d 929, 936 (7th Cir. 2015); *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012)). However, the claimant retains the burden to show that his

15

impairment or combination of impairments could have met or medically equaled the listing. *Ribaudo*, 458 F.3d at 583.

Here, the MRIs that Mr. B argues should have been reviewed by a medical expert do not show actual nerve root impingement or compression as discussed above. Mr. B wants the Court to weigh heavily Dr. Ghori's August 2017 statement that the April 2014 MRI showed "left sided disc herniation at L5-S1 impinging the left nerve root" as evidence of actual impingement. [*See, e.g.*, DE 22 at 3]. Unfortunately, Dr. Ghori's statement is not supported by the actual imaging report by Dr. Gregory as discussed above. Moreover, Mr. B has not provided other evidence to support favoring Dr. Ghori's statement over Dr. Gregory's explicit statement of no impingement. Furthermore, Mr. B has not pointed to any evidence besides the MRIs that could establish an equivalence finding.

Thus, Mr. B has not met his burden to demonstrate that his impairments satisfy all the criteria of Listing 1.04A or are medically equivalent to a listing. *See Ribaudo*, 458 F.3d at 583. Without more from Mr. B, the ALJ's technical error in failing to submit the MRIs to medical scrutiny related to listing equivalence is harmless and does not justify remand. *Cf. William M.*, 2020 WL 4676934, at *5.

**B.    Step Five Issues**

As to the ALJ's Step Five analysis, Mr. B argues that the ALJ did not meet her burden to show that jobs exist in the national economy exist in significant numbers that he could perform based on his age, education, work experience, and RFC. *See Clifford*, 227 F.3d at 868; 20 C.F.R. § 404.1520(a)(4)(v). An ALJ may rely upon expert testimony,

including a vocational expert's ("VE's") testimony, if it is reliable. *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004), *abrogated on other grounds by Biestek v. Berryhill*, 139 S. Ct. 1148 (2019). In fact, ALJs regularly employ VEs in determining whether a claimant retains the ability to perform work in specific occupations. *See, e.g., Taylor v. Colvin*, 829 F.3d 799, 801 (7th Cir. 2016); *Jentzen v. Colvin*, No. 14-cv-2029, 2016 WL 8672692, at *4 (N.D. Ind. Mar. 18, 2016). And ALJ conclusions regarding the availability of work for particular claimants have consistently been upheld as supported by substantial evidence when they are based upon VE testimony. *See Liskowitz v. Astrue*, 559 F.3d 736, 745–46 (7th Cir. 2009); *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989). However, the VE's data and reasoning supporting their opinions must be available on demand if the claimant challenges the foundation of the opinions. *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). In such situations, the ALJ should also inquire into the reliability of the VE's conclusions. *Brown v. Colvin*, 845 F.3d 247, 254–55 (7th Cir. 2016).

With that said, the Commissioner has not promulgated regulations prescribing any specific methodology for VE to use in estimating the number of jobs available in a particular occupation. *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018). Moreover, a VE's refusal to provide job market data to support his conclusion does not categorically preclude the VE's testimony from counting as substantial evidence in support of the ALJ's Step Five conclusion. *Biestek*, 139 S. Ct. at 1156–57. Thus, the evaluation of the reliability of a VE's testimony remains a case-by-case endeavor. *Id.*

Nevertheless, the Seventh Circuit—in several cases—has commented upon inadequate VE testimony and criticized VE methodology. *See, e.g., Taylor*, 829 F.3d at

802; *Alaura v. Colvin*, 797 F.3d 503, 507–08 (7th Cir. 2015); *Voigt v. Colvin*, 781 F.3d 871, 879 (7th Cir. 2015); *Browning v. Colvin*, 766 F.3d 702, 708–09 (7th Cir. 2014); *Hermann v. Colvin*, 772 F.3d 1110, 1113–14 (7th Cir. 2014). For instance, in *Alaura*, the Seventh Circuit expressed skepticism as to VE testimony relying on decades old job descriptions in the DOT. 797 F.3d at 507–08. The court pointed directly to the addresser job and questioned whether such a job actually exists anymore given advancements in technology. *Id.* In a concurring opinion in another case, a judge also suggested that some of the DOT job descriptions are labelled unskilled work but do not describe unskilled tasks. *Hill v. Colvin*, 807 F.3d 862, 872 (7th Cir. 2015).

While these criticisms of the use of the DOT in VE testimony raise some interesting questions, all these criticisms are merely *dicta* with no binding authority. *Adamec v. Berryhill*, No. 15-C-11811, 2017 WL 1196920, *6 (N.D. Ill. Mar. 31, 2017) (citing *Fitzgerald v. Colvin*, 15 CV 135, 2016 WL 447507, at *11 (W.D. Wis. Feb. 4, 2016) (explaining that neither *Voight* nor *Browning* overruled precedent allowing ALJs to rely on unexplained vocational testimony) and 20 C.F.R. §§ 404.1566(d)–(e) (allowing administrative notice of job information available from the DOT, among other sources)). Additionally, "the [Seventh Circuit] has not explicitly reversed an ALJ's conclusion simply because the vocational expert's testimony did not explain where his statistics were derived." *Hoffman v. Colvin*, No. 15-cv-940, 2016 WL 5107063, at *6 (E.D. Wis. Sept. 20, 2016). While well taken, a claimant's "criticism of the VE's methodology is not a basis for remand until appellate precedent instructs that relying on the methodology is reversible error." *Weir v. Colvin*, No. 15-cv-532, 2016 WL 4083524, at *3 (W.D. Wis. Aug.

1, 2016). The directives of SSR 00-4p on the use of vocational expert evidence and other reliable occupational information in disability decisions still guide ALJs in their Step Five analyses. SSR 00-4p requires ALJs to resolve conflicts between VE testimony and information in the DOT and explain in their decisions how the conflicts were resolved. 2000 WL 1898704, at *4 (Dec. 4, 2000).

Here, Mr. B challenges the reliability of the VE's testimony and the ALJ's reliance on that same testimony. More specifically, Mr. B alleges that the ALJ improperly relied upon outdated descriptions in the DOT of how jobs are performed, failed to explain the apparent inconsistencies between the VE's testimony and the DOT, and accepted the VE's mere speculation as to the number of jobs available in the national economy.

At Mr. B's hearing before the ALJ, the VE testified that given Mr. B's age, education, work experience, and RFC—presented as a hypothetical from the ALJ—he could perform the requirements of the following three jobs identified in the DOT: production inspector, production assembler, and addresser. [DE 12 at 67–68]. The VE first stated that 58,000 production inspector jobs, 55,000 production assembler jobs, and 140,000 addresser jobs were being performed nationally. [*Id.* at 67]. The ALJ then modified the hypothetical to the VE adding a sit/stand option after 30 minutes. The VE testified that Mr. B could still perform the same three jobs, but with the reduced numbers of 40,000 inspector jobs, 40,000 assembler jobs and 80,000 addresser jobs. [*Id.* at 68]. The VE then testified that his testimony was consistent with the DOT even if some of his comments were based solely upon his own experience and training. [*Id.* at 70]. Plaintiff's attorney subsequently questioned the VE.

Plaintiff's attorney first asked the VE if his conclusions would change with a sit/stand option every 15 minutes. [*Id.* at 70–71]. The VE stated that the change would not make a difference in terms of job numbers. But when questioned about where the previous reductions in job numbers had come from, the VE responded: "Only my professional opinion. Again, this is certainly not in the DOT." [*Id.* at 71]. The VE continued by stating that there was no absolutely accurate methodology for computing the job numbers but that his estimates were based upon his 40+ years of professional experience in vocational rehabilitation and job placement. [*Id.*].

In her decision, the ALJ acknowledged her reliance on the VE's testimony that 40,000 inspector and assembler jobs and 80,000 addresser jobs existed that Mr. B could perform. [DE 12 at 27]. She then stated in a single-sentence paragraph: "Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." [*Id.*].

### 1.    Reliance on Outdated Job Descriptions

Mr. B argues that many of the relevant inspector, assembler, and addresser jobs identified by the VE have changed since they were originally defined in the DOT bringing into question whether they should still be considered sedentary and unskilled in nature. While the jobs may have changed, Mr. B's speculative assertion about whether a person like him, with the RFC to perform sedentary, unskilled work, can still perform those jobs does not provide the Court with any evidence to suggest he cannot. Moreover, Mr. B has not offered any evidence to support disregarding the DOT, or the

VE's reliance upon it. As related above, no court—not even *Alaura* and *Hill* upon which Mr. B primarily relies—overrules the DOT job descriptions or a VE's ability to rely upon them. *See Adamec*, 2017 WL 1196920 at *6. In fact, SSR 00-4p still governs how an ALJ resolves conflicts between a VE's testimony and the DOT without precluding use of the DOT altogether. Therefore, Mr. B has not demonstrated any error in the ALJ's reliance on the VE's testimony regarding the production inspector, production assembler, and addresser jobs in making her Step Five finding.

### 2.   Consistency of VE's Testimony with the DOT

Mr. B also asks this Court to remand alleging that the ALJ did not explain how she reached her conclusion that the VE's testimony was consistent with the DOT. *See* SSR 00-4p. Technically, Mr. B is correct. The ALJ's decision only presents a conclusion without any explanation or reference to supportive information. However, Mr. B has not shown that any conflict with the DOT exists to be resolved and explained.

Mr. B implies that a conflict exists between the VE's professional opinion and the DOT based upon the VE's testimony that his job number reductions, upon the addition of the sit/stand option to the RFC, were "certainly not in the DOT." [*See* DE 12 at 71]. In the face of evidence of such a conflict, without any reasonable explanation by the ALJ, remand is indeed appropriate. *Butler v. Berryhill*, 1:18-cv-59, 2019 WL 442377, at *10 (N.D. Ind. Feb. 4, 2019). However, Mr. B overestimates the effect of the "not in the DOT" testimony he cites.

Just because information is not included in the DOT does not necessarily make it inconsistent with the DOT. In fact, the ALJ asked the VE whether his testimony,

21

including the job number reductions from the sit/stand option, were consistent with the DOT. [DE 12 at 70]. And the VE was quick to reiterate that his testimony included additional comments based only on his experience and training, but then stated: "I would suggest nothing here is inconsistent with anything that is in the DOT." [*Id.*]. The ALJ did not have to agree with the VE, but could. SSR 00-4p suggests just that possibility when it acknowledges that VEs are able to provide more specific information about jobs than the DOT. Further, Mr. B cites no authority to establish that all information outside the DOT is inconsistent with it.

And lastly, Mr. B has provided no evidence to establish an inconsistency between the VE's professional opinion and the DOT that requires resolution and explanation under SSR 00-4p. *Cf. Butler*, 2019 WL 442377, at *10. Without more, Mr. B has failed to show that the ALJ failed to comply with the requirements of SSR 00-4p in her Step Five consideration of the VE's testimony.

### 3.    VE's Speculation as to Job Number Availability

Mr. B takes his concern over the VE's testimony one step further and argues that it is not reliable because the VE merely speculated, without explanation or data, as to the number of inspector, assembler, and addresser jobs available. In support, Mr. B cites the VE's testimony, including the "certainly not in the DOT" comment, again. In response to Mr. B's attorney's question asking what the job number reductions were based on specifically, the VE stated:

> Only my professional opinion. Again, this is certainly not in the DOT. I think we're getting—we're talking about different types of variables where you really can't, you know, use any set methodology or practice

and suggest numbers that would be accurate in any manner. So, again, I only rely on my almost 40 — well, over 40 years of vocational rehab experience and job placement, et cetera. There are very common entry-level-type jobs. So it's really a professional estimate based on my experience and really nothing more than that. I don't think one can really do more than that.

[DE 12 at 71–72]. Mr. B contends that this statement shows that the VE "conjured [the job availability numbers] out of whole cloth, not reliant on any sort of data." [DE 20 at 19]. He also challenges the reliability of the VE's numbers because his professional experience did not include any statistical analysis of job numbers in the national economy. [*Id.*]. Yet Mr. B's arguments miss the mark.

First, "a vocational expert's testimony may count as substantial evidence even when unaccompanied by supporting data." *Biestek*, 139 S. Ct. at 1152, 1157.

Second, Mr. B's attorney probed the basis of the VE's testimony at the hearing and learned that his numbers were not "conjured out of whole cloth" as Mr. B alleges but were based on his professional experience and training. [DE 12 at 71]. Moreover, the ALJ had already testified in response to the ALJ's questioning as to his process for calculating the numbers. [DE 12 at 68]. With this explanation from the VE of the foundation and methodology he used to calculate the job availability numbers he reported, plus the entire administrative record, the ALJ had substantial evidence before her from which to assess the reliability of the VE's testimony. *See Biestek*, 139 S. Ct. at 1156–57.

Third, Mr. B's attorney never inquired at the hearing as to the specific nature of the VE's professional experience. Yet now Mr. B suggests, in a conclusory manner

without any support, that the VE's professional experience in vocational rehabilitation and job placement does not qualify him to calculate job availability numbers. Thus, his complaint now is a bit late. Regardless of the timing, however, Mr. B's argument is inconsistent with SSR 00-4p, which allows VEs to invoke "publicly available sources[,] . . . information obtained directly from employers and data otherwise developed from their own experience in job placement or career counseling." *Biestek*, 139 S. Ct. at 1152–53 (citing SSR 00-4p) (internal quotations omitted). After all, the VE's stated experience in vocational rehabilitation and job placement mirrors the experience in "job placement or career counseling" the SSA has expressly found relevant to occupational information. *See* SSR 00-4p.

Understandably, Mr. B is challenging the reliability of the VE's testimony in an attempt to ensure full and fair consideration of his disability applications. Indeed, ALJs should inquire as to the reliability of any expert in a way similar to the expert analysis under Fed. R. Evid. 702. *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006); *Donahue*, 279 F.3d at 446. Here, however, Mr. B presents no authority or evidence to show that the VE's methodology for calculating job availability numbers is flawed, that his numbers were inaccurate, or that his professional experience was not applicable. Thus, any failure to inquire further into the reliability of the VE's testimony is not significant enough to be deemed prejudicial to Mr. B. *Cf. Rector v. Acting Comm'r of Soc. Sec. Admin.*, 2018 WL 2174140, at *4 (N.D. Ind. May 10, 2018).

Moreover, Mr. B has fails to demonstrate how the VE's professional experience precluded an accurate result. , the Court finds that the VE's testimony constitutes the substantial evidence necessary to affirm the ALJ's Step Five conclusion.

Thus, the ALJ's Step Five analysis is not grounds for remand in this case.

## IV.    CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that the ALJ's decision finding Ms. B not disabled under the Social Security Act be **AFFIRMED**.

**SO ORDERED** this 25th day of September 2020.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge

**NOTICE IS HEREBY GIVEN** that within fourteen (14) days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed finding and/or recommendations. Fed. R. Civ. P. 72(b). **FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRIC COURT'S ORDER.**